Good morning, Your Honors. My name is Peter Sessions. I represent the plaintiff and the appellant in this action, Kristen C. I'd like to reserve two minutes for rebuttal, if I may. This case is about a young woman who suffers from a terrible disease, anorexia nervosa, as well as other physical conditions which are related to her eating disorder, includes gastroparesis, osteopenia, tachycardia, and the record shows that she's suffered from this disease since she was 14 years old and that she has a severe case of this disorder. In fact, in April of 2014 she was hospitalized for a condition in Denver, and while she was in the hospital her weight had reduced to 62 pounds, and there are some alarming photos in the record which show what her condition was like at that time. So after a discharge from the hospital, she's then admitted to Montanito, which is a residential treatment facility which specializes in the treatment of eating disorders, and it's this treatment which is the subject of this appeal. And while she's at receiving the intensive treatment that she needs in order to get better, unfortunately her reward for improving is the eventual denial of her claim for benefits by the defendant, Blue Shield. Now our contention in this appeal is that Blue Shield's decision and the district court's decision upholding that decision were incorrect, and we've presented two interrelated reasons in our brief for why that's so. One has to do with the standard of review. Our contention is that the district court misapplied the abusive discretion standard of review. And our second argument is that under any standard of review, depending on, regardless of how much deference the district court should have showed to Blue Shield's decision, the decision was incorrect. So those are the two issues that we presented. Blue Shield in its brief has also presented a third issue regarding standing, and I don't know if the Court has any preference with regard to which order I proceed. Perhaps I should address the standing issue first. And our first objection to Blue Shield's standing issue is it's primarily a procedural one. Blue Shield, unfortunately, raised this issue the day before trial in front of the district court. And in this court, it did not file a notice of cross-appeal on the issue and instead waited until its brief to alert us and the Court that this was an issue that it wanted to present on appeal. But standing is jurisdictional. I understand that the issue is — it's jurisdictional and that the Court can exercise its discretion to address the issue. But I would hope that the Court would take into consideration, at the very least, the way it's been presented and take a skeptical look at it for that reason. But it doesn't matter in any event, because Kristin clearly had standing to bring this action. She signed both an admission agreement and a financial agreement when she was admitted to Montanito in which she promised to pay for her treatment. And that's the gist of Blue Shield's argument, which is she doesn't owe Montanito any money, and therefore she has no standing. But clearly, the financial agreement, which Kristin signed, says, quote, payment for treatment is ultimately the responsibility of the client, including treatment provided after an insurance denial. And that's exactly what happened here. So Kristin has clearly agreed that she's required to pay Montanito for her treatment, even in the event of an insurance denial. This show up on our credit report if she doesn't pay it? Well, that's up to Montanito. I assume it would. They're waiting for the outcome of this litigation to see what they should do. But they certainly have every right to pursue payment, because Kristin has promised to pay them. Now, Blue Shield's argument against this, trying to counter this, is the participation agreement. My question was meant to elicit whether there are consequential effects, even if she ultimately doesn't owe it, and whether there are interim consequential consequences. Well, there would be if she owes the money. So, yeah, there would be consequences. Blue Shield tries to counter this by referring to the participation agreement, which is not an agreement to which Blue Shield is actually a party. It's an agreement between its vendor, Magellan, and Montanito. And they say that there are provisions in that agreement which support their standing argument. But this agreement should not be considered by the court, because it's not a planned document. Under ERISA, the plan is the central controlling document. It's the document that everyone should be able to consult to see what their rights and duties and obligations are. And planned provisions can't be subverted by documents that are outside of the plan. And as I mentioned, Blue Shield isn't even a party to this agreement. And obviously, Kristin's not a party to that agreement either. So the parties to that agreement are Montanito and Magellan. So for a similar reason, the court shouldn't hold that an ERISA beneficiary's right under a plan can be changed and negated somehow because of a contract between third parties who are not planned administrators. They don't have any say in the plan's operation. Now, that said, if Blue Shield is still upset with Montanito, that doesn't mean it doesn't have a remedy. Its remedy, as the district court properly noted, is to pursue relief under that agreement. But the provisions of that agreement, which are not planned documents, shouldn't be injected into this case. And certainly not in a way, certainly not in a dispositive fashion. ERISA is a statute that the courts have interpreted as intended to protect beneficiaries. And the courts have held that standing is supposed to be construed liberally under ERISA. And allowing this third-party agreement that nobody's a party to, and that Kristin doesn't even know anything about, allowing that agreement to somehow prevent her from making any claim whatsoever under the plan is unacceptable under ERISA. So the relief, just to be clear, the relief you're seeking in this case is effectively a declaration that Blue Shield should have permitted the continued residential care. That's correct. And your argument is, it's similar to a declaratory judgment in a sense, that once a court would declare what you want, that would essentially ensure no further injury occurs to your client through the third-party agreement. Right. Well, I mean, our argument is essentially that the third-party agreement is not relevant. Well, I mean, it is relevant in the sense that that's what gets your client into the courtroom, right? Because the third-party agreement is what conceivably injures your, I mean, I'm talking about third-party agreement between the facility and your client, correct? Oh, that, yes. I was referring to the participation agreement, but you're referring to, I see what you're saying. So that's what, in a sense, what you're asking us to do is just to declare, in effect, that Blue Shield made a mistake. And because Blue Shield made a mistake, your client cannot be hit up for the costs that would be incurred from this facility. That's right. That would be the consequence. So let me ask you, because it seems to be our question here is that, did the plan, or did Blue Shield abuse its discretion by denying the stay? And I just want to make sure I understand the timing here. Sure. So, and again, I don't fault your client for any of this, but we have to look at all the facts here. The clinic contacts Blue Shield right before Labor Day weekend? That's correct. And then, obviously, the communication could have been a lot better than what happened here, and I think that's one of the things we'll be inquiring into. But from Blue Shield's perspective, I'm not sure what else, what more could Blue Shield, I mean, obviously, they could have made more efforts to contact and But here, it seems to me the facility could have done a lot better, too, and the facility didn't contact them until late Friday before a Labor Day weekend. I mean, they could have made the contact on Tuesday or Wednesday. Everyone knew Labor Day weekend was coming up. So shouldn't we factor that into our consideration as to whether Blue Shield blew it here? No, because the claim wasn't denied until that Friday. So they appealed as soon as they could. They appealed the same day. And the timing, of course, is unfortunate. And so what our argument is, is what ERISA calls for is communication between the administrator and the treatment providers to make sure they're making the right decision on a claim. And the record shows in this case that they spent two hours on it. The appeal came in at the end of the day on Friday, and then within two hours, they generated a denial letter. And our argument is that they should have waited. They should have consulted with Montanito. Had a discussion with them about Kristen's condition, and then made a decision. But when did Montanito contact Blue Shield, saying that, you know, this is going to be very stressful, the boyfriend's back in the picture? When did that initial contact occur? Well, they had already discussed Kristen's situation with Blue Shield, and there had been ongoing discussions. But with regard to when... Is your question after the appeal? When was the next time they had a... No, I mean, as I understand the record, and this is why you can help me out here, is that the Labor Day weekend was approaching, and someone contacted someone first. Did the facility contact Montanito? Did it contact Blue Shield and say, hey, the weekend's coming up, she really needs to stay the weekend because the boyfriend's back in town? Or did something else start this process that led to the denial and led to the appeal? No, the denial occurred first, and then Montanito followed up. But what, Jen, or I guess what I'm asking is that, was there a previous agreement or understanding that your client would be out of the facility that week? Or did Blue Shield just out of the blue say, hey, Labor Day weekend's coming up, you got to be out of here? No. Well, more like the latter. The way these claims work is that the insurance company approves treatment for time periods, usually a week at a time. And Blue Shield had not indicated previously that this was going to be the end. So at the time it denied the claim, there was no. And that was on the Friday? Yes. Okay. There was, it was a surprise. Because they had been paying benefits up until that point. That's what I was trying to get at. Thank you. And this is, I'm sorry. Let's assume, hypothetically, that there was a procedural error in the denial of the claim on Friday. Why isn't that cured or rendered harmless by the reconsideration later? Would that have included all of the medical records? Well, they certainly, when I say they, I mean Montanito certainly had the ability to provide records, and they did so later. And Blue Shield considered them. Right. And then they rejected. So what's the error, as long as they were afforded the opportunity for reconsideration on a full record? The reason we bring it up is not to say that she didn't get any kind of review of her claim. The reason is, we bring it up, is in the context of determining how much deference the court should give to the decision. And the reason we bring it up is because this very quick, I would argue, railroaded way they handled it shows that their decisions on the merits, regardless of whether they got documents in the future or not, shows that they were biased in favor of denying the claim. And I'd like to add, since my time is getting short, this is only one thing we've cited, one reason we've cited for why this court should be skeptical of what Blue Shield did. We've identified other problems, which is that Blue Shield used the same doctors more than once, which is against ERISA regulations, which says that appeal determinations can't give deference to prior reviews, can't be conducted by the same reviewer. They had Dr. Carlton review the claim, he made a medical necessity determination, and then they gave it back to Dr. Carlton again after they got more records. And both times, the denial letter was written by Blue Shield's Dr. Batten. They should have had different doctors on different occasions. And speaking of Dr. Batten, who signed both of the denial letters, he's a gynecologist. ERISA requires that benefit decisions be based on medical judgments to be made by healthcare professionals who have appropriate training and experience. Dr. Batten didn't have that experience. Blue Shield doesn't contend that he did have that experience. He shouldn't be signing denial letters for mental health cases. And finally, we've argued that Blue Shield didn't request an examination of Kristen. Now, ERISA doesn't require that examinations be made of patients in every health case. That's certainly not the case. But in the mental health context, which is particularly tricky, those evaluations can be highly helpful. And this court held in the Pacific Shores case that exactly that, which is that in cases where there's a significant difference of opinion with regard to what level of treatment someone needs, an evaluation can be very helpful. So those are the procedural reasons why we think that the court should be highly skeptical. On the merits of whether she needed the treatment at all, we think that the record is very clear. She'd repeatedly failed at lower levels of treatment. And let me back up a second. Blue Shield's argument is that Kristen could have received more treatment at a lower level. So Blue Shield's argument is that she didn't need the treatment, but she could have been at a lower level, lower than residential, which was, in this case, partial hospitalization or PHP treatment. But the record shows that she had tried PHP treatment. In the past, it had been unsuccessful. Outpatient treatment hadn't worked. And it's important to emphasize the difference between residential treatment and PHP treatment. Residential treatment is you are living in a facility, and you can be monitored at all times. Typically, patients are not monitored at all times because that's too intrusive, but they can be. And PHP treatment is very different. It's essentially day treatment. The patient visits the facility during the day for programming, but in the mornings before they show up and in the evenings when they go home, there's no one around to help them. And the record shows that Kristen had no support network. Blue Shield's own claim notes state that, quote, patient's family is not a support system. She had an abusive family history. Her father's an alcoholic, in fact, called Montanito up drunk. Her mother said she didn't want to be involved in Kristen's treatment because she was afraid that she'd be blamed for Kristen's condition. The only support she had was her boyfriend, who broke up with her during treatment. So this is a person who left her own devices, clearly would have struggled. And the reason we know she would have struggled is because Montanito's clinical notes show that she was struggling. She was constantly thinking about how she could lose weight. While she had gained weight overall during the program, she had lost weight just prior to the denial decision. She was suspected by Montanito of binging and purging right around at the time of the denial. The reason they suspected this is because she had significantly elevated heart rates. Her sitting standing pulse was 146 and 152. And for that reason, she was placed on increased observation by Montanito. And all this is going on right around the time of the denial. So it's our argument that this combination of the clinical notes, which clearly show that she was struggling, her lack of support outside the program, and the fact that Blue Shield made missteps in the way they handled the claim. This combination of factors should have led the district court to find that Blue Shield's decision was unreasonable and was abuse of discretion. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honor. Joseph Laska for defendant and appellee. May it please the court. Unless the court has a specific place where it would like to begin today, I'd actually like to begin by addressing a couple of the points in appellant's reply brief specifically regarding standing. So I think that that's where the district court should have started. They argue in their reply brief that the district court held that Kristen is responsible for the unpaid bill to Montanito. So first of all, that is not an accurate reading of the order. The order actually says that Kristen has adequately alleged standing. And as we argued, that's not sufficient at that stage of the proceedings, which was, at that day, a trial. The district court had an obligation to look at the evidence that was submitted. And in this case, there was no evidence submitted of standing. And in fact, the court gave appellant supplemental briefing after the trial, and an opportunity to present additional evidence and briefing of standing. And the only evidence that was presented was an attorney declaration purporting to authenticate a ledger sheet from Montanito, the facility that shows. It just strikes me that if the Ninth Circuit were to rule that an insured does not have standing to bring a claim against an insurer for denial of, for inappropriate denial of coverage, that would just, that would be earth shaking. Well, the holding in this case, Your Honor, would not be anywhere near that broad. Well, it seems to me, just kind of, that you're kind of on the horns of this dilemma. Namely, you're saying, well, she doesn't have standing because she doesn't owe the money. But when you get to the merits, you say there's a genuine, there's a dispute about whether she was entitled to coverage. And we denied it, and she asserts that that decision was wrong, and that she proceeded to have to engage in liability, or at least facially engage in liability. And you say, we owe it. We owe it. So you're saying on one hand, we don't owe it, and on the other hand, you're saying we do owe it. And that seems to me just a very awkward position for you to take on the standing issue. What am I missing? I'm happy to address that, Your Honor. I think, first of all, our argument on the merits obviously presumes that the court has found standing, has presumed that the money is owed to someone, or maybe owed to someone. Not just the money is owed, but the whole process by which the debt was incurred seems to me a collateral consequence of the decision. And also, Your Honor, you have to understand the way that this works under these particular types of health policies. This is, actually, it's not an HMO policy. It's a PPO, but in some ways, it functions. Forget insurance. Forget anything. Just think of it this way. That if somebody is obliged to pay someone on my behalf, and they don't do it, and I have to engage in what are extraordinary efforts to cover the debt and bring an action against the lender in this case, it would strike me as particularly unusual for the lender to say, oh, no, you don't have standing because we're going to pay the, go ahead and pay the debt. Well, you didn't pay it in the first place. There are collateral consequences to your failure to pay, and now you are just saying, well, as long as we ultimately pay it, you're out of court. That strikes me as wrong. Your Honor, I don't know that there are collateral consequences here. I think the only Oh, I mean, just the stress to this, to any patient, would seem to me to be a consequence. Your Honor, the stress of of owing having an insurance company say they don't owe it, and then turn around when a lawsuit is brought to make that very determination and say, oh, well, we're going to pay it, and therefore you don't have standing. I mean, I've asked you already, so. No, Your Honor, I'm meeting end of your time, so go ahead. I'm happy to address this, and it's that the relationship between Blue Shield through its mental health services administrator, Magellan, and Montanito, they have a contract, and under that contract, Montanito provides covered services to Blue Shield's members, and in exchange, Are you conceding before us that, yes, you owe this bill? No, Your Honor, I'm not conceding that. What we're conceding is that if money is owed, it would be owed to Montanito, not to plaintiff. Right. That's all that we're saying. So let's assume for the sake of argument that this plays out, and Montanito sues Christen C., what happens then? All you're arguing is that they have a defense by virtue of the third-party contract, right? Well, not quite, Your Honor. Nothing prevents them from suing Christen C. for the debt if it's owed. You claim that under a separate agreement they've agreed not to pursue that, but that's potentially a third-party beneficiary argument to the suit. But I got to tell you, this happens more than you would expect on these preferred provider agreements where actually the provider does go after the patient even though they have these agreements. So there's certainly a risk there, and we just don't have the record to know whether it's how much of a risk. So why not — why haven't she — why isn't she alleged to sufficient standing to get into court? I think you have to look at the actual agreements here. The Court has — There's no agreement between Christen C. and Blue Shield that says that Blue Shield will not — will prevent Montanito — the facility from collecting. And actually, Your Honor, you just used the word alleged, which is the same word that the district court used. But this was at the final stage of the case. I don't think we've ever reversed a district court for failure to inquire on standing, as you're alleging. I mean, basically, you're saying the district court should have had a trial on standing, but the district court was sufficient. Now, we've got the records in front of us. We can make our own judgment. But she certainly has a risk of suit. What I'm — I'm not so much suggesting that — that the district court should — well, the district court, we do believe, should have looked at the evidence. That's right. I don't think that the case would necessarily have to be remanded. I think this court could look at the evidence itself and make the determination. But when the court — when this court is looking at the evidence, what it's looking at is it can essentially do that analysis that — that the court was just suggesting, but actually play it out. We know she has a risk of suit because she signed a contract to pay. True? Presumably. Yeah. So, your argument is that she has a defense to the suit. Your Honor, anyone can sue anyone. I don't know that the mere risk of a suit is — is enough for Article III standing under the Constitution. I think she has to show an actual — Well, you won't concede to us that in any case in which an insured proceeds to pay a contested bill, that you owe it under the agreement. I'm trying to understand the Court's question. That if — if the money were determined to be owed? What do you mean if it's determined to be owed? If an insured is in a hospital and there's a question about the data — I'm speaking in the abstract here because I prefer to understand cases in the abstract first and then go to the particulars. If a patient is in a hospital and there's a dispute between the patient and the insurer about whether the patient should be discharged, and the patient makes a judgment that in her or his best interest, the patient should remain in the hospital, at that point, under your agreement with the hospital, you're saying that you owe the money, not the patient, and therefore, the patient doesn't have standing to vindicate any rights he may — he or she may have. What we're saying is it would depend on the nature of — Once you start getting into the depends, it seems to me you're in court. Well, indeed, but again, the point is that in this case, the panel has the evidence that it would need to see how that — how that court decision would turn out, and that's what — that was the district court's obligation, and I would submit that it's this Court's role as well on the appeal to actually look at the evidence and determine, well, does she actually owe the money? The district court can't look at the evidence if there's no standing. You're out of court. Well, at the evidence on standing, Your Honor, is what I mean. Right, but I mean, at the end of the day, she signed a contract to pay the money, and you claim that she has a defense to that. Yes, a very good one. A very good defense, but that would require resolution, and I'll just tell you, in the real world, there are providers who, regardless of their agreement with the insurer, there are providers who go after patients for the excess amount, so she's got a defense, potentially, but there's enough risk there to probably get her at standing. Your Honor, I think it's a — Otherwise, why would she pursue this appeal? I mean, that's — she thought there was no risk. Well — I mean, she pursued this case because she thought there was risk. She — Likely. It's difficult for me to respond to that, Your Honor. Well, there may be some things outside the record I don't know, but that's — There may be. Now, going to the abstract, would you say, then, and this patient name — we'll name the patient Abstract. Abstract goes to the hospital. There's a dispute about whether he should be discharged or not with the insurance company, and so Abstract signs an agreement agreeing to pay the bill himself, and he then sues, as is this case, and you take the position. There's no standing because we are going to pay the bill if it's owed. I think I understand your position. That's — yes, Your Honor. All right. So it seems to me that in every — that would be a terrible result for you because in every conceivable case that there's a dispute about whether there's to be coverage or not, the patient ultimately has the final decision. He goes ahead and does whatever he bloody well pleases, and you're stuck for the bill anyway. So what's the use of arguing about coverage? You're going to pay it. Under your theory, you're going to pay the bill no matter what if there's — if, in fact, it's determined to be due. Yes, Your Honor, and we can argue with coverage about — we can argue about coverage with the facility, which is the entity that would be receiving the money. So what about the poor patient who's stuck there with the bill until you and the facility resolve your disputes? Your Honor — And look, we've covered enough. You probably have other points you want to make. We probably beat this horse to it. But if I could, Counselor, direct you to excerpts of record page 312, which is the plan. As I understand it, it's the criteria for continued stay under the plan. 3A.3 says that the disposition, planning, and or attempts at therapeutic re-entering to the community have resulted in or would result in an exacerbation of the eating disorder to the degree that would necessitate continued residential treatment. In this case, considering the compressed timeline that we have, I think that Friday is the key day. Is your argument that what Blue Shield did in combination with the facility satisfies that prong for a continued stay? Well, it shows that that prong wasn't satisfied, Your Honor. That's what I mean. That Blue Shield did what it was supposed to do. Yes, Your Honor, and here's why. Actually, that brings up something that Counsel said in an argument that I would like to address, which is he said that it was a surprise when this was denied on the 29th, that there was no warning. That's actually contradicted by the record. The record shows that on August 22nd, Dr. Zapotel, in doing yet another one of the concurrent reviews to see whether additional treatment was medically necessary, he said, I'm paraphrasing, but it appears the patient is getting better. It appears the patient is ready to leave residential treatment, but I'm going to approve coverage for one more week to allow for discharge planning. And the record shows that there was no discharge planning by Montanito. They just continued to treat her. They submitted another request for more time on the 29th. It was denied that morning. And then at 4.59 p.m. on the Friday before a holiday weekend, they submitted an expedited appeal, which requires, under ERISA regulations, requires a response from Blue Shield within 72 hours. And it's not in the record, and it would be speculation, but they appear to have left the office for the long weekend because nobody responded until Tuesday morning. And so what Blue Shield did was, even though there was evidence in the record that residential treatment was no longer medically necessary, it did not deny it on that ground. It denied it for lack of medical records because when Montanito submitted its expedited appeal, it did not submit any records, which would have been customary, and it invited her or the facility to produce additional records. And they did, and they reviewed it, and Dr. Radwan, an independent third-party board-certified psychiatrist, spoke with the treating physician at Montanito, and based on all of that, they made the medical necessity decision. And it was the district court's job to review all that evidence at trial and to apply the abuse of discretion standard, which is what the district court did. And so we submit that that portion of the decision certainly should be upheld and affirmed. Thank you, counsel. Thank you, Your Honor. We'll give you two minutes for rebuttal. I don't know if there are any issues that the Court would like me to revisit in particular. Could you address what he just spoke about? Sure. I think what he just said, if I'm not mistaken, is two things. And one is that this shouldn't have been a surprise to Montanito. And I think what the Court needs to understand is the way that these claims are processed by insurance companies. As I said earlier, they approve them week to week, and that's what had happened here. And insurance companies are constantly telling facilities, we're going to pay for one more week, we're going to pay for one more week, we think your client is doing better. So there was no reason for Montanito to think that this was the last and final straw. The other thing that counsel said was that this was an expedited appeal, and therefore they were required to act on it quickly. And that's certainly true. But under ERISA, the problem is there's two kinds of appeals you can take. And one is the expedited appeal, which is 72 hours, and the other one is the regular appeal, which can take weeks. So when faced with that decision, Montanito clearly had to choose the expedited appeal because they couldn't wait for weeks to find out whether Blue Shield was going to pay for this ongoing, very expensive treatment. So at that point, there was no reason why Blue Shield could not have contacted Montanito and said, look, this is bad timing. It's right before the holiday weekend. Can you give us an extension on the 72 hours? Certainly Montanito would have agreed to that because this was not an emergency situation. But Blue Shield didn't do that. Instead, they decided within two hours that they were going to deny the claim without consulting. So those are the primary problems that we have with the way they handled it procedurally, in addition to the other procedural problems that I already mentioned, which is the fact that they used the same doctors over and over and used doctors who didn't have any expertise in this field. So if we were to agree with you, I'm just trying to think procedurally how this case goes. I understand how Blue Shield wants this case procedurally to go. But from your perspective, if we were to agree with you in this case, we would be saying that the district court erred in granting summary judgment under this current standard review. We would be sending it back to the trial court for what? Well, I think the court has two options. One option is to say it doesn't matter how much deference we give to what Blue Shield did. The result was incorrect. And so, therefore, we're going to reverse and order that benefits be paid. The other option is to say plaintiff, you've alleged that there were these procedural problems that should have reduced the district court's deference to the decision, so we need to send it back to the district court to apply to look at the evidence again under this new less deferential standard of review. Obviously, we'd prefer the former, but I think the latter is available also. Is there another alternative for us to either stay or defer submission until a determination has been made as to whether Blue Cross Blue Shield in fact pays the bill, in which case, unless you've alleged other damages, the case becomes moot? Well, Blue Shield has indicated that it's not paying these benefits. That was my understanding. I don't see any purpose. Why isn't it an option for us to wait and see while the hospital and they duke it out to find out the fact they're going to pay it? Well, I would like to think that Blue Shield would step in at some point and initiate some kind of action against Montaner to say you violated this agreement and, therefore, you have to or don't have to do X, Y, and Z. But they haven't done that, and they haven't given any indication that they're going to do that. So I think we have to proceed here. The amount at stake is $28,000. Is that right? I believe that's correct. Okay. Thank you. Thank you, Your Honor. Thank you for your arguments. The case just argued will be submitted for decision, and we'll be in recess.
judges: Lucero, Thomas, Owens